# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL CASE NO. 5:18-cv-00164-MR

RICKY HOBART PARSONS,    )
                                  )
            **Plaintiff,**      )
                                  )       <u>**MEMORANDUM OF**</u>
**vs.**                   )      <u>**DECISION AND ORDER**</u>
                                  )
**KEN BEAVER, et al.,**     )
                                  )
           **Defendants.**    )
_____ )

**THIS MATTER** comes before the Court on Motions for Summary Judgment by Defendants Beaver, Dye, Hensley, Murray, Padgett, and Jolley [Docs. 45, 48] and Motions to Seal by these Defendants [Doc. 47, 49].

## I.    PROCEDURAL BACKGROUND

Plaintiff Ricky Hobart Parsons ("Plaintiff"), proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 for the violation of his civil rights while incarcerated at the Alexander Correctional Institution ("Alexander").[1] [Doc. 1]. The Complaint asserted a deliberate indifference claim against Alexander employees Correctional Officer Perry Padgett, Correctional Officer Leigh Hensley, Nurse Rhonda Jolley, Nurse Practitioner ("NP") Cathy

_____

[1] Plaintiff is now housed at Central Prison in Raleigh, North Carolina.

Arnie, NP FNU Gaberial, and Nurse Bernadette Hatch[2] and a denial of access to the courts claim against Alexander employees Warden Ken Beaver, Associate Warden Eric Dye, and Assistant Unit Manager Christopher Murray. [Id.]. The Complaint survived this Court's initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A and Plaintiff proceeded with his claims. [Doc. 9]. Defendants Arnie and Gaberial were dismissed as Defendants in this matter, after notice, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure on Plaintiff's failure to timely serve them. [Docs. 53, 54]. Default was entered against Defendant Hatch after she failed to answer or otherwise respond to Plaintiff's Complaint. [Doc. 33]. Plaintiff has not sought entry of default judgment.

Defendants Beaver, Dye, Hensley, Murray, and Padgett moved for summary judgment of Plaintiff's Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure and to seal their memorandum and exhibits submitted in support thereof as containing Plaintiff's sensitive medical information. [Docs. 45, 47]. In support of their summary judgment motion, these Defendants submitted a memorandum, the declarations of Pamela

---

[2] Although Plaintiff identified Defendants Arnie, Hatch, and Gaberial as employees of the North Carolina Department of Public Safety (NCDPS), Defendants Arnie and Hatch were contract nurses not employed by the NCDPS and the NCDPS was not able to locate or identify Defendant Gaberial in its databases. [Doc. 1 at 6-7; Doc. 13].

2

Chapman,[3] and Defendants Beaver, Hensley, Padgett, Murray, and Dye; Plaintiff's medical records; a record of a disciplinary infraction from May 30, 2017; a statement by Defendant Hatch regarding a September 14, 2017 incident; and a record of "custody observations" of Plaintiff from September 13 to September 15, 2017. [Docs. 46, 46-1 to 46-6].

Defendant Jolley also filed a motion for summary judgment and similar motion to seal. [Docs. 48, 49]. In support of her summary judgment motion, Defendant Jolley submitted a memorandum, her own declaration, and select medical records of Plaintiff. [Docs. 50, 50-1].

Thereafter, the Court entered orders in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing responses to the summary judgment motions and of the manner in which evidence could be submitted to the Court. [Docs. 51, 52]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

---

[3] Pamela Chapman is employed by the NCDPS and is currently assigned to Alexander as a Nurse Supervisor II for that facility. [Doc. 46-1 at ¶ 3: Chapman Dec.].

declarations, stipulation (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 2-3 (citing Fed. R. Civ. P. 56(c)(4))]. Plaintiff has filed nothing in response to Defendants' summary judgment motions. Thus, in terms of evidentiary forecast, the Defendants' is unrefuted.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

4

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.   FACTUAL BACKGROUND

### A.    Plaintiff's Allegations

In his Complaint,[4] Plaintiff alleged, in pertinent part, as follows.

On May 30, 2017, at approximately 8:30 p.m., Plaintiff was in his room at Alexander.  He started having acute chest pain radiating into his left arm and lower jaw.  Plaintiff went to the door in the dayroom and reported to an unidentified correctional officer that he was having chest pains and needed to declare a medical emergency.  The officer told Plaintiff to sit down and that he would inform the nurse.  The officer returned approximately two minutes later and took Plaintiff to the treatment room on Blue Unit.  Plaintiff was seen by Nurse Jolley.  Nurse Menhinick was also present and observed what happened.  Plaintiff described the pain he was having to Nurse Jolley and Nurse Jolley took Plaintiff's vital signs.  Plaintiff then asked her if he could have a nitroglycerin[5] tablet, which Nurse Jolley refused. Nurse Jolley

---

[4] It is noted that Plaintiff's Complaint is not verified.  In fact, it is unsigned. [Doc. 1].

[5] Nitroglycerin is a medication used to treat and prevent chest pain.

6

also refused to do an EKG[6] "even though there [was] a standing order to do [an] EKG when [Plaintiff] declare[d] a medical emergency for chest pain." [Doc. 1 at 19]. Nurse Jolley also failed to call the on-call medical provider as provided in the nursing protocol. Nurse Jolley directed Plaintiff to return to his cell and to declare another medical emergency if he continued to have chest pain. At approximately 10:00 p.m. Plaintiff returned to the dayroom door and told a different, unidentified correctional officer that he needed to declare another medical emergency for chest pains. The officer had Plaintiff sit in the hallway while he informed Nurse Jolley. The officer returned to Plaintiff and told Plaintiff that Nurse Jolley refused to see him and that she was going to write Plaintiff up for malingering. Nurse Jolley did write up the Plaintiff, charging him with "faking a medical illness or injury." [Id. at 19-20]. Plaintiff pleaded guilty to this infraction to receive a reduced punishment and to avoid being put in segregation. [Id.].

Then, on June 21, 2017, at approximately 10:00 a.m., Plaintiff declared a medical emergency for chest pains. He was taken to the medical treatment room on Red Unit because he was in segregation at the time. An unidentified nurse took Plaintiff's vital signs and NP Gaberial, who was also in the room,

---

[6] An EKG, or electrocardiogram, records the electrical signal from your heart to check for certain heart conditions.

ordered the nurse to do an EKG.  When the results were printed out, Plaintiff saw that the EKG result was "abnormal," but NP Gaberial told Plaintiff it was normal.  Plaintiff asked NP Gaberial to give him a nitroglycerin tablet, but she refused.  Plaintiff also asked her to write an order allowing Plaintiff to self-medicate with nitroglycerin, but she refused that as well because Plaintiff was a suicide risk with self-medication.  [Id. at 20-21].  NP Gaberial also told Plaintiff that he was not allowed to self-medicate because Plaintiff was an outpatient mental health inmate and because nitroglycerin comes in a glass bottle and policy, therefore, prevents inmates from self-medicating with it. [Id. at 21].

On September 14, 2017, at approximately 1:00 a.m. while Plaintiff was in his cell on Red Unit, he started having chest pains radiating into his left arm, perfuse sweating, and nausea. When Officer Hensley made rounds at 1:30 a.m., Plaintiff told her that he needed to declare a medical emergency for chest pains and directed Hensley to get his nitroglycerin.  [Id. at 22]. Hensley advised Plaintiff that she would tell Nurse Hatch, who was the charge nurse on Red Unit that night.  Nurse Hatch never responded to Plaintiff's emergency and did not bring Plaintiff's nitroglycerin.  [Id.]. Thereafter, Plaintiff passed out in his cell.  [Id. at 23].  At 2:30 a.m., Officer Hensley was making rounds and observed Plaintiff unconscious on the floor

but failed to call a "Code Blue." A "Code Blue" is a medical emergency declared by the correctional staff that results in response by all nurses on duty. [Id. at 23]. Plaintiff's was not seen by medical personnel until approximately 13 hours later. [Id.].

On September 14, 2017 at 9:00 a.m., Plaintiff submitted a five-page grievance to an unidentified correctional officer on "A" block of Red Unit. The grievance regarded Officer Hensley finding Plaintiff unconscious and failing to do anything. [Id. at 25]. The grievance was directed to Assistant Unit Manager Murray, who is responsible for answering grievances at the Step One level. [Id.]. Plaintiff never received a response to that grievance and further attempts at submitting grievances about that incident were rejected. [Id.].

At approximately 1:45 p.m. the same day, Officer Padgett came to Plaintiff's cell and asked why Plaintiff had declared a medical emergency. Plaintiff told Padgett that he was having chest pains and needed his medication. Padgett said that Nurse Hatch had said that Plaintiff had a medical appointment at 9:00 a.m. and that Plaintiff could wait until then.[7] Officer Padgett refused to take Plaintiff to the treatment room for medical

_____

[7] Although Plaintiff's allegations on this point are unclear, it appears that Plaintiff may be referring to a medical appointment he had the following day, September 15, 2017, where an EKG was performed on Plaintiff. [See Doc. 46-1 at 29].

attention. [Id. at 23]. At approximately 2:30 p.m., Plaintiff was taken to the treatment room on Red Unit and seen by NP Arnie. Plaintiff told NP Arnie about the preceding night's events. NP Arnie also refused Plaintiff's request for nitroglycerin as self-medication. [Id. at 24]. Plaintiff asked NP Arnie to order a cardiologist consultation and baby aspirin for the Plaintiff. Although she said she would, she never made either of these orders. [Id.].

On October 7, 2017, Plaintiff wrote a letter to Defendant Beaver requesting the full name, job description, and shield number of all Defendants named in this Complaint. Beaver did not respond to Plaintiff's letter or otherwise give Plaintiff the information he requested. [Id. at 25]. Finally, on October 12, 2017, Plaintiff wrote Defendant Eric Dye for the same information. Dye refused to give Plaintiff the information and did not answer Plaintiff's letter. [Id.]. For relief, Plaintiff seeks compensatory and punitive damages and injunctive relief. [Id. at 28-29].

### B. Defendants' Evidentiary Forecast

The evidentiary forecast before the Court, which consists of affidavits from the Defendants and Pamela Chapman, the Plaintiff's medical records, and various prison records, demonstrates the absence of a genuine issue of material fact on Plaintiff's claims. As stated above, Plaintiff did not come forward with anything other than mere allegations to defeat Defendants'

motions. As such, the Court may only consider Defendants' forecast of evidence for purposes of this motion. Defendants' evidentiary forecast shows the following:

### 1. Medical Care

From March 2017 to January 2018, Nurse Jolley was employed with the NCDPS at Alexander as a Clinical Night Nurse. [Doc. 50-1 at ¶ 5: Jolley Dec.]. On the evening of May 30, 2017, Nurse Jolley was working with Nurse Patricia Menhinick in the Alexander medical unit, although Nurse Jolley's name does not appear on the Clinical Encounter Notes for that visit. [Id. at ¶¶ 8-9]. At approximately 8:15 p.m., Plaintiff declared a medical emergency due to complaints of chest pain. Plaintiff was evaluated by Nurses Jolley and Menhinick. [Id. at ¶ 10]. After performing a physical exam and evaluation of the Plaintiff, Nurses Jolley and Menhinick determined there was no objective evidence to support Plaintiff's claims of chest pain or a medical emergency, despite Plaintiff's history of chronic ischemic heart disease. Plaintiff was calm, in no apparent distress, and had normal vital signs. [Id.]. Based on Nurse Jolley's clinical judgment, the Plaintiff's complaints, physical exam, vital signs, and consultation with Nurse Menhinick, Nurse Jolley determined that neither an EKG nor nitroglycerin were medically indicated. [Id. at ¶ 12]. Furthermore, there was no standing order for an EKG to be

performed or for Plaintiff to receive nitroglycerin any time he complained of chest pain.  [Id. at ¶ 12; Doc. 46-1 at ¶¶ 21-22].  Of note, the preceding five EKGs that had been administered on the Plaintiff were normal.  [Id. at 6].  While Plaintiff did have a prescription for nitroglycerin,[8] Plaintiff did not present with objective symptoms indicating a need for its administration.  [Id. at ¶ 12].  Plaintiff was given two antacid tabs, treated for indigestion per nursing protocol, and returned to his cell with instructions to wait two hours.  [Id. at ¶ 10 and p. 8].  Rather than waiting as directed, Plaintiff declared three more medical emergencies over the next 90 minutes.  [Id. at ¶ 10].

Plaintiff is what is known as a "frequent flyer" in the medical unit.  During 2017 alone, Plaintiff was seen 284 times.  [Id. at ¶ 11; Doc. 46-1 at ¶ 11; see Doc. 46-1 at 19-33].  Plaintiff had a reputation for and had been diagnosed with malingering and self-injurious behavior, including ingesting foreign objects so that he could go to the hospital.[9]  [Id.; Doc. 46-1 at ¶¶ 10-

---

[8] Under certain circumstances, an offender may be issued a 30-day supply of "Keep on Person" (KOP) medication.  [Doc. 46-1 at ¶ 8].  Only certain drugs and certain offenders, however, are eligible to participate in the KOP program.  "An offender can be denied participation in the KOP program for any of the following reasons: (1) the medication is excluded from the self-administration program; (2) the offender is noncompliant; (3) the offender is a medication abuser; (4) the offender has a prohibitive medical condition (i.e., unstable illness, mentally retarded [sic]); (5) the offender refuses medication; (6) facility administration, in consultation with medical staff, determines self-medication program is inappropriate; and/or (7) the medication is ordered DOT [direct observation therapy] by the provider."  [Id. at ¶ 8].  Plaintiff has a history of medication refusal, noncompliance, and abuse of pain medications and sedatives.  [Id. at ¶¶ 14-15].

[9] Plaintiff has been diagnosed with, in pertinent part, opioid use disorder; sedative,

12].  On the evening of May 30, 2017, Nurses Jolley and Menhinick advised the Plaintiff that his behavior was considered malingering and that he would be charged as such.  [Id.].  Based on the evaluation performed by Nurses Jolley and Menhinick, they determined that Plaintiff was malingering and filed a disciplinary infraction against him accordingly.  [Doc. 50-1 at ¶¶ 11-12; see Doc. 50-1 at pp. 11-13].  Plaintiff pleaded guilty to this malingering infraction.  [Id. at p. 12].

At no time did Nurse Jolley ignore or disregard Plaintiff's complaints or presentation.  [Id. at ¶ 13].  Nurse Jolley took appropriate action and made professional decisions and treatment recommendations based on her physical examination and evaluation of Plaintiff's medical condition.  None of the decisions made by Nurse Jolley were for the purpose of causing harm to the Plaintiff.  [Id.].

In September 2017, Defendants Leigh Hensley and Perry Padgett were Correctional Officers at Alexander.  [Doc. 46-3 at ¶ 2: Hensley Dec.; Doc. 46-4 at ¶ 2: Padgett Dec.].  In the early morning hours of September 14, 2017, Plaintiff self-declared a medical emergency.  [Doc. 46-3 at ¶ 5].

---

hypnotic, or anxiolytic use disorder; bipolar disorder; paranoid schizophrenia; generalized anxiety; heartburn; malingerer; suicidal ideations; noncompliance with medication; unspecified heart disease; other chest pain; borderline personality disorder; and a history of self-harm.  [Doc. 46-1 at ¶ 10: Chapman Dec.].

When Defendant Hensley saw the Plaintiff, he did not exhibit any signs of distress; he had no shortness of breath or sweating, he was able to speak coherently, his skin was normal, and he was able to walk around his cell. [Id.]. Although Defendant Hensley, from her own personal observation, did not believe Plaintiff needed emergency medical care, she relied primarily on the advice of Nurse Hatch. [Id. at ¶ 6]. For those reasons, she did not believe it was necessary to take Plaintiff to the medical unit or to call a Code Blue. [Id.]. Defendant Padgett also observed the Plaintiff after being informed of his self-declared medical emergency and, like Defendant Hensley, noted the lack of any signs or symptoms of distress. [Doc. 46-4 at ¶ 5]. Defendant Padgett contacted Nurse Hatch who told Padgett that Plaintiff's situation was not an emergency and that Plaintiff could wait. [Id.]. Like Defendant Hensley, Padgett did not believe Plaintiff needed emergency medical care, but he relied primarily on the advice of Nurse Hatch. [Id. at ¶ 6].

Defendants Hensley and Padgett were also aware of Plaintiff's well-known history of self-declaring excessive and unnecessary, unsubstantiated medical emergencies. [Doc. 46-3 at ¶ 7; Doc. 46-4 at ¶ 7]. At no time during the early morning hours of September 14, 2017 did Defendants Hensley or Padgett observe Plaintiff unconscious in his cell. Had these Defendants found Plaintiff unconscious, they would have called a Code Blue. [Id. at ¶ 8;

Doc. 46-4 at ¶ 8]. Furthermore, contrary to Plaintiff's allegation, the records show that Defendant Hensley did not make rounds for Plaintiff during the time of Plaintiff's alleged unconsciousness, but rather it was Officers Lett and Snyder who made rounds for Plaintiff. [Doc. 46-3 at ¶ 9 and at pp. 5-6].

## 2. Denial of Access to the Courts

In October 2017, Defendant Ken Beaver was the Warden at Alexander, Defendant Eric Dye was the Associate Warden, and Defendant Christopher Murray was an Assistant Unit Manager. [Doc. 46-2 at ¶ 2: Beaver Dec.; Doc. 46-5 at ¶ 2: Murray Dec.; Doc. 46-6 at ¶ 2].

Defendant Murray's duties, as an Assistant Unit Manager, include, among other things, handling offender administrative remedy procedures. [Doc. 46-5 at ¶ 3]. Offenders may submit their grievances to an officer, a sergeant, or an assistant unit manager, such as Murray. [See id. at ¶ 5]. If Defendant Murray receives a grievance, it is submitted through and tracked within the administrative remedy process. [Id.]. On September 15, 2017, Plaintiff submitted a grievance regarding the events of the previous day, which Murray received on September 21, 2017. [Id. at ¶ 6]. After Murray received the grievance, he accepted it and began an investigation. After receiving information from staff, Defendant Murray completed the Step One grievance process. Plaintiff appealed the grievance through Step Three.

[Id.].  Defendant Murray does not recall ever receiving a grievance from Plaintiff dated September 14, 2017.  [Id. at ¶ 7].  If he had received such a grievance, assuming it was acceptable under the administrative remedy procedure, he would have processed it like any other grievance.  [Id.].

As to Defendant Beaver, when he receives correspondence from inmates that he believes can best be handled within the housing unit, he forwards such correspondence to the appropriate housing unit.  [Doc. 46-2 at ¶ 4].  Defendant Beaver forwards most of the correspondence he receives to the housing units.  [Id.].  Defendant Dye similarly forwards correspondence from offenders regarding day-to-day matters to the housing unit to respond.  [Doc. 46-6 at ¶ 4].  If the matter is sufficiently serious such that Defendant Dye believes a facility level response is required, he handles the matter himself.  [Id.].

Neither Defendant Beaver nor Defendant Dye recall ever having received any written correspondence from Plaintiff.  [Doc. 46-2 at ¶ 5].  Specifically, neither of these Defendants recall ever receiving written correspondence from Plaintiff requesting the full name, job description, and shield numbers of various NCDPS employees.  [Id. at ¶ 6; Doc. 46-6 at ¶ 5].  To the extent Plaintiff ever made any medical complaints or requests,

16

Defendant Beaver would have informed the Nurse Manager, who responds to such complaints or requests. [Doc. 46-2 at ¶ 5].

## IV.   DISCUSSION

### A.   Deliberate Indifference

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the [prisoner] or that they actually knew of and ignored a [prisoner]'s serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable

Section 1983 claim.  <u>Estelle</u>, 429 U.S. at 106; <u>Grayson v. Peed</u>, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").  "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." <u>Stokes v. Hurdle</u>, 393 F. Supp. 757, 762 (D. Md. 1975), <u>aff'd</u>, 535 F.2d 1250 (4th Cir. 1976).  Further, the constitutional right is to medical care.  No right exists to the type or scope of care desired by the individual prisoner.  <u>Id.</u> at 763.  Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994); <u>Johnson v. Quinones</u>, 145 F.3d 164, 167 (4th Cir. 1998).  <u>Farmer</u>, 511 U.S. 825, 837 (1994).  A prison official, however, is not liable if he knew the

underlying facts but believed, even if unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent. Farmer, 511 U.S. at 837.

### 1. Nurses Jolley and Hatch

In denying Nurse Jolley's Rule 12(b)(6) motion to dismiss for failure to state a claim, this Court noted that "this case presents a very close call" and that Plaintiff "is saved only by his allegation that there was a standing order to administer an EKG in the face of Plaintiff's complaints of chest pain." [Doc. 34 at 6]. Now, the uncontroverted forecast of evidence shows that there was no such order. The forecast of evidence also shows that Defendant Jolley promptly and properly examined the Plaintiff on May 30, 2017 and appropriately determined that an EKG and nitroglycerin were not clinically indicated. The forecast of evidence simply does not support a claim of deliberate indifference against Nurse Jolley and there is no genuine issue for trial.

As for Nurse Hatch, as noted, default was entered against her on October 29, 2019. [Doc. 34]. She is, therefore, deemed to have admitted the well-pleaded factual allegations against her. See Ryan v. Homecomings Financial Network, 253 F.3d 778, 780 (4th Cir. 2001) (citation omitted). A default, however, "is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." Id. Plaintiff has not moved

19

for default judgment against Nurse Hatch. Given the age of this case and pending motions for summary judgment by all other remaining Defendants in this matter, the Court will *sua sponte* address Plaintiff's claim against Nurse Hatch here and determine whether Plaintiff's allegations support a finding of liability against her.[10]   See J&J Sports Productions, Inc. v. Romenski, 845 F.Supp.2d 703 (2012); see also Wright, Miller & Kane, Federal Practice and Procedure § 2688 (3d ed. Supp. 2010) ("[L]iability is not deemed established simply because of the default … and the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.").

The Court turns to Plaintiff's allegations.  After recounting his recent, previous self-declared, though unsubstantiated, medical emergencies, Plaintiff alleged that Nurse Hatch, who was the charge nurse on Red Unit the night of September 14, 2017, did not respond to Plaintiff's self-declared medical emergency and never brought Plaintiff the nitroglycerin he demanded.  Plaintiff also alleged that Officer Padgett told Plaintiff that Nurse Hatch said the Plaintiff had a medical appointment at 9:00 a.m., presumably the following day, and that Plaintiff could wait until then.

---

[10] Alternatively, the Court could dismiss Nurse Hatch for Plaintiff's failure to prosecute his claim against her.  It has been over a year since the Clerk entered default against her and Plaintiff has not pursued judgment against her.

Despite having survived the low hurdle of initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A, Plaintiff has failed to state a claim for relief based on deliberate indifference to Plaintiff's serious medical needs against Nurse Hatch. Namely, Plaintiff's allegations do not support (nor does the forecast of undisputed evidence show) that Nurse Hatch "actually knew of and ignored [Plaintiff's] serious need for medical care." <u>Young</u>, 238 F.3d at 575-76. Rather, Plaintiff's allegations tend to show that Nurse Hatch reasonably believed, if anything, that Plaintiff declared yet another medical emergency to get medication he did not need. Plaintiff's allegations also show (and the record supports) that Plaintiff had a medical appointment scheduled the next day and that Plaintiff would be evaluated then.

In sum, because Plaintiff's allegations do not state a claim or support a finding of liability against Nurse Hatch, his deliberate indifference claim against her will also be dismissed.

### 2.    Officers Hensley and Padgett

To be found liable under the Eighth Amendment, a prison official must know of and consciously disregard "an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837. An official is not liable, however, where he believed, even if unsoundly, that the risk to a prisoner was insubstantial or nonexistent. <u>Id.</u>

As for Officer Padgett, despite having survived the low hurdle of initial review, Plaintiff has failed to state a claim based on Officer Padgett's alleged deliberate indifference to Plaintiff's serious medical needs. According to Plaintiff, Officer Padgett visit Plaintiff's cell on the afternoon of September 14, 2017 and asked why Plaintiff had self-declared a medical emergency in the early morning hours. Plaintiff further alleged that Officer Padgett relayed to Plaintiff that Nurse Hatch had told Padgett that Plaintiff had a medical appointment the following morning and that Plaintiff could wait until then.

At best, Plaintiff's allegations show that Officer Padgett declined to take Plaintiff to the treatment room after having been told by a healthcare provider that Plaintiff could wait until the next day for medical care. Plaintiff fails to allege, and presents no forecast of evidence showing, that Officer Padgett knew of and consciously disregarded "and excessive risk" to Plaintiff's health and safety. Rather, Plaintiff's allegations show that Padgett relied on Nurse Hatch's advice.

Further, while Plaintiff may have stated a claim for relief based on deliberate indifference against Defendant Hensley for having alleged that she ignored Plaintiff unconscious in his cell, the unrebutted forecast of evidence plainly shows that Officers Hensley and Padgett were not deliberately indifferent to Plaintiff's serious medical needs. Namely, when

Officers Hensley and Padgett saw Plaintiff in the early morning hours of September 14, 2017, Plaintiff exhibited no signs of distress. Plaintiff had no shortness of breath or sweating. He was able to speak coherently. His skin was normal. And he was able to walk around his cell. Neither Officer Hensley nor Padgett believed Plaintiff needed emergency medical care and both primarily relied on Nurse Hatch's advice that Plaintiff's situation was not an emergency. Both Officers were aware of Plaintiff's well-known history of malingering and excessive self-declarations of later unsubstantiated medical emergencies. Finally, neither Officer saw Plaintiff unconscious in his cell early that morning and, if they had, they would have called a Code Blue.

As such, the forecast of evidence simply does not support a claim of deliberate indifference against Officers Hensley or Padgett and there is no genuine issue for trial.

### B. Denial of Access to the Courts

The Supreme Court stated in <u>Bounds v. Smith</u>, 430 U.S. 817 (1977), that prisoners must have meaningful access to the courts. The "meaningful access" referred to in <u>Bounds</u> does not, however, entitle a plaintiff to total or unlimited access. <u>See</u> <u>Moore v. Gray</u>, No. 5:04-CT-918-FL, 2005 WL 3448047, at *1 (E.D.N.C. Jan. 26, 2005), <u>aff'd</u>, 133 Fed. App'x 913 (4th Cir. 2005) (unpublished) (citation omitted). The right of access to the courts only

requires that prisoners have the capability of bringing challenges to sentences or conditions of confinement. See Lewis v. Casey, 518 U.S. 343, 356-57 (1996). Moreover, as a jurisdictional requirement flowing from the standing doctrine, the prisoner must allege an actual injury. See id. at 349. "Actual injury" is prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or present a non-frivolous claim. See id. A plaintiff's "[f]ailure to show that a 'nonfrivolous legal claim has been frustrated' is fatal to his Bounds claim." Alvarez v. Hill, 518 F.3d 1152, 1155 n.1 (9th Cir. 2008) (quoting Casey, 518 U.S. at 353).

Here, again, although Plaintiff's Complaint generally survived the low hurdle of initial review under 28 U.S.C. §§ 1915(e)(2) and 1915A, Plaintiff has not stated a claim upon which relief may be granted against Defendants Beaver, Dye, or Murray based on the denial of access to the courts. Plaintiff has failed to allege that any non-frivolous claim was frustrated by the alleged, though unsubstantiated, conduct of these Defendants. Because Plaintiff has failed to state a claim for relief in the first instance, there is no genuine issue for trial.[11] As such, Defendants Beaver, Dye, and Murray are entitled to judgment as a matter of law. Furthermore, even if Plaintiff had stated a claim, he presented no forecast of evidence to refute Defendants' forecast of

---

[11] These Defendants did not file a Motion to Dismiss pursuant to Rule 12(b)(6).

Case 5:18-cv-00164-MR   Document 55   Filed 01/08/21   Page 24 of 28

evidence that no constitutional violation occurred. As such, Plaintiff's claims against these Defendants will be dismissed.[12]

## B. Motions to Seal

Defendants, through counsel, move the Court to seal their summary judgment memoranda and exhibits submitted therewith, including the declarations, various prison records, and Plaintiff's medical records, "because those documents discuss Plaintiff's sensitive medical information." [Docs. 47, 49]. Defendants filed these documents under seal. [See Docs. 46, 50].

Before sealing a court document, the Court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000). In the present case, the public has been provided with adequate notice and an opportunity to object to the Defendants' motions. Defendants filed their motions in April 2020, and they have been accessible through the Court's electronic case

---

[12] The Court also notes that, because Plaintiff did not establish the violation of a constitutional right, all Defendants are also entitled to qualified immunity in their individual capacities, in any event. See Saucier v. Katz, 533 U.S. 194, 201 (2001).

filing system since that time. Defendants, however, move to seal all the documents they submitted in support of their summary judgment motions, including their memoranda, all declarations, and all records. The records include Plaintiff's medical records, but also include prison records that do not contain Plaintiff's sensitive medical information.

As to the medical records (and the Declaration of Pamela Chapmen, which describes them in relative detail), the public's right of access to such information is substantially outweighed by the Plaintiff's competing interest in protecting the details of such information. Having considered less drastic alternatives to sealing these particular documents, the Court concludes that sealing these records is necessary to protect the Plaintiff's privacy interests. Defendants however make no such showing as to the remainder of the records they ask the Court to seal. As such, the Court will order that the Plaintiff's medical records and the Declaration of Pamela Chapman, filed at Docket Entry 46-1 and 50-1, remain under seal and that the remainder of the records be unsealed.

## V. CONCLUSION

For all the foregoing reasons, Defendants' motions for summary judgment are granted and motions to seal are granted in part. Furthermore,

Defendant Hatch is dismissed as a Defendant in this matter for Plaintiff's failure to state a claim against her.

## O R D E R

**IT IS, THEREFORE, ORDERED** that Defendants' Motions for Summary Judgment [Docs. 45, 48] are **GRANTED** and this matter is dismissed.

**IT IS FURTHER ORDERED** that the Motion to Seal by Defendants Beaver, Dye, Murray, Padgett, and Hensley [Doc. 47] is **GRANTED IN PART** and the documents filed at Docket Entry 46-1 shall remain sealed and the remainder of the documents at Docket Entry 46 shall be unsealed.

**IT IS FURTHER ORDERED** that Defendant Jolley's Motion to Seal [Doc. 49] is **GRANTED IN PART** and the documents filed at Docket Entry 50-1 at pages 5-9 shall remain sealed and the remainder of the documents at Docket Entry 50 shall be unsealed.

**IT IS FURTHER ORDERED** that Plaintiff's claim against Defendant Hatch is **DISMISSED** and Defendant Hatch is **DISMISSED** as a Defendant in this matter.

The Clerk is respectfully instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: January 7, 2021

Martin Reidinger
Chief United States District Judge